**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| JUJU, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-402-CFC |
| | ) | |
| NATIVE MEDIA, LLC, THOMAS J. | ) | |
| SCHOLLMEYER, II, CAROLINE | ) | |
| BANKS, JOHN DOE CORPORATIONS | ) | |
| 1-10 and JOHN AND JANE DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**REPORT AND RECOMMENDATION**</u>

Presently before the Court in this civil matter is a motion to dismiss the claims in the operative Third Amended Complaint ("TAC"), filed by Defendants Native Media, LLC, ("Native"), Thomas J. Schollmeyer, II and Caroline Banks (collectively "Defendants"), pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). (D.I. 84) For the reasons set forth below, the Court recommends that Defendants' Motion be GRANTED-IN-PART and DENIED-IN-PART.

**I.     BACKGROUND**

   **A.     Factual Background**

Plaintiff Juju, Inc. ("Plaintiff") and Native were parties to "pay per click" contractual arrangements, which give rise to the allegations in this case. Additional relevant facts regarding the parties and their interactions are set out below.

   **1.     The Parties and Their "Pay Per Click" Agreements**

Plaintiff is a Delaware corporation with its principal place of business in New York City. (D.I. 82 ("TAC")) at ¶ 5). Plaintiff owns and operates a web domain, http://juju.com, which, "functions not as a job board, but rather as a job search engine intended to facilitate and make

more efficient the process by which its users[] conduct [i]nternet-based [job] searches." (*Id.* at ¶ 15; *see also id.* at ¶¶ 16-17) Plaintiff touts its "unique search functionalities and comprehensive search results" that distinguish it from other search engines. (*Id.* at ¶ 16)

Defendant Native is a Florida limited liability company. (*Id.* at ¶ 18) Defendants Mr. Schollmeyer and Mrs. Banks are husband and wife and are also the sole members and employees of Native. (*Id.* at ¶¶ 18, 20, 25) The record shows that Native is operated out of Mr. Schollmeyer and Mrs. Banks's home in Florida, (*id.* at ¶ 20), and that it conducts no business apart from the business it had with Plaintiff, (*id.* at ¶ 25).

Plaintiff and Native were parties to three contractual agreements, which are described more fully below. By way of these agreements, Plaintiff paid Native to "publish" (that is, to distribute) e-mails that contained clickable URL hyperlinks to Plaintiff's job search results and the like (the "Program Data"). (*Id*. at ¶¶ 29-30) In return, Plaintiff paid Native for each time a reader clicked on one of the hyperlinks. (*Id.* at ¶ 29) This is known as a "pay-per-click" or "PPC" arrangement. (*Id.*)

Plaintiff had two key mechanisms to keep track of clicks originating from its publishers, such as Native. First, each publisher was given a unique identification code. (*Id.* at ¶¶ 48-49) From this identification code, Plaintiff could trace each click back to its publisher. (*Id*. at ¶ 48) Plaintiff ultimately did this for purposes of "determining the Publisher's share of the revenue generated by such click activity." (*Id.*) Second, Plaintiff kept track of the internet protocol ("IP") addresses from which the click originated. (*Id.* at ¶¶ 34 & n.2, 50) Plaintiff's "data-capturing functionalities and protocols" allowed it to extract the IP addresses from these clicks, as well as the times and dates of the clicks. (*Id.* at ¶ 34)

The goal of Plaintiff's web advertising is "conversions"—here, the "submission of a[ job] application by [users] genuinely interested in the job position advertised" on Plaintiff's website. (*Id.* at ¶ 42)  In light of the fact that Plaintiff paid Native "per click," Plaintiff had an interest in paying only for clicks borne out of genuine interest in its web content.  (*Id*. at ¶ 40)  Plaintiff describes this as the "quality" of web traffic that comes to its site.  (*Id.*)  A higher ratio of conversions to clicks signals higher "quality" traffic; a lower ratio of conversions to clicks signals lower "quality" traffic.  (*Id.* at ¶ 40)  Lower quality traffic can indicate that the clicks are "false, artificial, manufactured, or the product of something other than bona fide User interest and activity[.]"  (*Id.*)

Plaintiff is able to analyze the data related to these clicks—including the users' IP addresses, how many times a user at a particular IP address clicked on an advertisement and how close in time such clicks occurred—in order to determine whether the clicks were the product of genuine interest from a user, or instead were likely the product of fraudulent click activity.  (*Id*. at ¶ 50-52, 144-45)  This is necessary thing for Plaintiff to do, because publishers and those paid per click sometimes generate false and/or fraudulent clicks in order to increase their earnings. (*Id.* at ¶ 63)  For example, "click fraud" can occur when "either a (natural) person, automated script, or computer program, sometimes referred to as a 'bot,' simulates the click activity of a legitimate . . . User by clicking on the Program Data displayed, but without having an actual interest in its subject matter or content."  (*Id.*)  While publishers can manually click on the links themselves (or pay others to do so), bots are far more efficient because they have the "augmented capacity for executing far larger volumes of clicks, and in far shorter periods of time[.]"  (*Id.* at ¶ 65)  Thus bots tend to be "the instruments of choice among publishers keen on perpetrating click fraud for purposes of reaping windfall payments (for poor to zero quality traffic)[.]"  (*Id.*)

### 2. The Agreements

Plaintiff and Native are alleged to have been parties to three agreements: the Publisher Program Agreement, the Acceptable Use Policy, and the Juju Publisher Signup Form.[1] These will be described in turn below.

The Publisher Program Agreement ("Program Agreement") "enable[d] Publisher [Native] to display job search results from Juju and its advertiser affiliates on Publisher's Web site and earn a share of revenue from such content." (*Id.*, ex. A at ¶ 1(a)) The Program Agreement imposed a number of different types of obligations on Native relevant here, including the following:

- The agreement included a set of obligations related to click fraud. Native agreed "to cooperate with [Plaintiff] in any investigation of . . . attempts to fraudulently inflate the volume of impressions or clicks from the Approved Sites." (*Id.*, ex. A at ¶ 2(b)) Further to this provision, Native agreed to "implement all reasonable corrective actions requested by [Plaintiff] to correct and prevent such activities." (*Id.*) Similarly, Native agreed that it would not "generate automated, fraudulent or otherwise invalid impressions, inquiries, conversions, clicks or other actions[.]" (*Id.*, ex. A at ¶ 3)

- Second, the agreement also contained a compensation provision that addressed valid and invalid clicks. There, Plaintiff agreed to compensate Native only for "valid clicks[.]" (*Id.*, ex. A at ¶ 4) Determining whether a click was valid or not was left to Plaintiff's discretion. (*See id.*) This provision also stated that Plaintiff would not compensate Native "for any clicks or other transactions generated by [Native] or any party acting on [its] behalf." (*Id.*) The provision also included a fee-shifting provision, that stated "[i]f [Plaintiff] refunds fees to an advertiser for any reason, then [Native] shall refund [its] corresponding revenue share to [Plaintiff.]" (*Id.*)

---

[1] Plaintiff attached the three contracts at issue to the TAC as Exhibits A-C. (TAC, exs. A-C) As will be further discussed below, none of the contracts has a signature line at the end where a representative for each party would sign. (*Id.*) Instead, the contracts are so-called "clickwrap agreements," wherein one of the parties to the agreement manifests assent by clicking a button on its computer. (D.I. 91 at 14)

- Finally, the Program Agreement contained a mix of other relevant provisions.  There was a confidentiality clause, whereby Native agreed "not to make Juju Confidential Information available in any form to any third party or to use Juju Confidential Information for any purpose other than the implementation of this Agreement."  (*Id*., ex. A at ¶ 5(a))  There was a survival clause, whereby certain obligations survived the term of the agreement.  (*Id.*, ex. A at ¶ 8)  And finally, the agreement included a reference to the Acceptable Use Policy, whereby Native also agreed to comply with the terms of that policy (further described below).  (*Id.*, ex. A at ¶ 3)

The second of the three agreements, the Acceptable Use Policy, contained terms that,

*inter alia*, focused on false clicks.  Per these terms, Native agreed not to:

- "[C]lick on its own ads or use any means to inflate clicks artificially;"

- "[U]se deceptive or unnatural means to draw attention or to incite clicks or use of Program Data; . . . [or]"

- "[E]ngage in any method to artificially and/or fraudulently inflate the volume of impressions or clicks associated with Program Data or other sponsored advertising, including but not limited to: repeated manual clicks; the use of robots or other automated query tools and/or computer-generated search requests; . . . or any other technique of generating automatic or fraudulent (as determined by Juju, acting reasonably, based on industry practices) clicks and/or impressions[.]"

(*Id.*, ex. B at ¶¶ 5(b), (e) & (g))

The last of the three agreements was the Publisher Signup Form ("Signup Form").  Per

the Signup Form, a party simply clicked on certain boxes to indicate that it had:  (1) "read and

agree[d] to Juju's Publisher Program Agreement" and (2) "read and agree[d] to Juju's

Acceptable Use Policy[.]"  (*Id.*, ex. C (emphasis omitted))  Plaintiff alleges that Defendants

"Schollmeyer and/or Banks" acting on behalf of Native, did in fact click on each of these two

boxes, thereby agreeing that Native would be bound by the Program Agreement and the Acceptable Use Policy.  (*Id.* at ¶ 91)

### 3.      The Parties' Dealings

Plaintiff alleges that from about December 2017 to January 2018, "certain of [its] advertising affiliates complained to [them] of substantial volumes of low quality traffic, which were confirmed by Plaintiff through examination of, *inter alia*, the URLs and Publisher identification codes associated with such traffic, to be attributable to Native." (*Id.* at ¶ 101) Prompted to investigate, two of Plaintiff's employees, Matthew Swanson and Mike Dusanic sought information from a third Juju employee, Christopher Campbell.  (*Id.* at ¶¶ 96, 102)  Mr. Campbell was the employee "responsible for monitoring and policing publisher click activity and traffic quality[.]"  (*Id.* at ¶ 102)  Mr. Campbell explained to Mr. Swanson and Mr. Dusanic that he had already discussed the issue with "Schollmeyer and/or Banks," and that they "had assured him that any abnormalities in respect of [Native's] traffic would be forthwith rectified."  (*Id.* at ¶ 103)  Further, Mr. Campbell requested that Mr. Swanson and Mr. Dusanic not disclose to Plaintiff's principal, Euan Hayward, the potentially fraudulent click traffic attributable to Native. (*Id.* at ¶ 104)  Plaintiff alleges that this pattern—whereby (1) Mr. Swanson or Mr. Dusanic would confront Mr. Campbell with concerns relating to "volumes of potentially fraudulent click activity" attributable to Native, then (2) Mr. Campbell would give "the same evasive explanations and/or assurances that the matter had already been addressed with, and would be resolved by, Schollmeyer and/or Banks" and then (3) Mr. Campbell would "request that [Mr. Swanson and/or Mr. Dusanic] not disclose to [Mr.] Hayward" anything about the issue— recurred several more times through March 2017.  (*Id.* at ¶ 105)

Independent of these dealings between Mr. Swanson/Mr. Dusanic and Mr. Campbell, Mr. Hayward himself addressed the potentially fraudulent click traffic directly with Mr. Schollmeyer. In an e-mail exchange occurring between January 28, 2018 and February 2, 2018, Mr. Schollmeyer reassured Mr. Hayward that "no violation of the Program Agreements had occurred, and that any potentially fraudulent click activity attributed to Native was the product not of any fraud, but rather mere inadvertence, and would be promptly rectified."  (*Id.* at ¶ 115)

Plaintiff alleges that it became aware of misconduct on the part of Mr. Campbell, Mr. Schollmeyer, and Mrs. Banks in March 2018.  In February 2018, Mr. Campbell voluntarily terminated his employment with Plaintiff.  (*Id*. at ¶ 119)  Then, on or about March 6, 2018, a few days after Mr. Campbell left Plaintiff's employ, Mr. Hayward accessed Mr. Campbell's e-mail account, as part of the "ordinary process of off-boarding a departing employee[.]"  (*Id*. at ¶¶ 119-20)  While Mr. Hayward was accessing Mr. Campbell's e-mail account, Mr. Hayward observed an e-mail sent from Mr. Schollmeyer to Mr. Campbell which read, "FYI.  All good things come to an end."  (*Id.* at ¶¶ 121-22)  Below this e-mail message, Mr. Schollmeyer had included a forwarded e-mail chain consisting of messages sent between Mr. Schollmeyer and Mr. Hayward; in that e-mail chain, Mr. Hayward was notifying Mr. Schollmeyer that he was terminating Native's contracts with Plaintiff, due to "a mountain of evidence that the traffic [generated from Native's publishing] is fraudulent."  (*Id.* at ¶¶ 123-24)

Mr. Hayward responded to Mr. Schollmeyer's March 6, 2018 e-mail, writing from Mr. Campbell's account (as if he were Mr. Campbell).  (*Id.* at ¶ 125)  He wrote:  "When are you going to send me my cut from the last check?"  (*Id*.)  Five minutes later, Mr. Schollmeyer responded:  "When I get one.  I start doing lead gen[eration] for the largest ADT reseller in the country tomorrow.  Fingers crossed."  (*Id.* at ¶ 126)

### 4. Plaintiff's Further Investigation and Damages Associated with Defendants' Conduct

Armed with this information, Plaintiff further analyzed the click traffic originating from Native. Its investigation revealed a number of indicators that this traffic had been fraudulent. Among these were the following:

- Clicks attributable to Native resulted in a "substantially low" conversion rate during the last year of Native's participation in the program (from March 2017 through March 2018)—three times lower than that of other publishers during the same time period. (*Id.* at ¶¶ 132-33)

- Among the 200,000 IP addresses attributable to Native, only about 1,000 addresses accounted for 22% of Native's clicks during this time period. (*Id.* at ¶ 135) In other words, 0.43% of all of Native's IP addresses were responsible for 22% of all of Native's clicks. (*Id.*) Moreover, Native's top users during this time period were 3.5 times more active than the top users of all other publishers. (*Id.* at ¶ 136)

- Plaintiff also detected evidence of artificial and/or automated clicks through "useragent" data. According to Plaintiff, a "'useragent' is a term that describes the manner in which a user's web browser software (e.g., Microsoft Internet Explorer, Mozilla Firefox, Apple Safari) identifies itself to the server through which the user's traffic is routed en route to the destination website sought to be accessed through the User's click of hyperlinked content." (*Id.* at ¶ 139) The data associated with Native revealed that 31% of Native's traffic was associated with useragent "Mozilla/5.0 (Windows NT 6.1; WOW64; Trident/7.0; rv:11.0) like Gecko[.]" (*Id.* at ¶ 140) Native's traffic used this useragent 2.8 times more frequently than other publishers did. (*Id.*) And this particular useragent has allegedly been associated with click fraud. (*Id.* at ¶ 143 & n.9)

- Plaintiff's analysis revealed that Native's allegedly fraudulent activity—which includes "lengthy runs of clicks from particular IP addresses . . . exhibit[s] all of the hallmarks of automated click activity," specifically, "large clusters of clicks followed by semi-randomized delays of a range of time, immediately followed by another flurry or concentrated cluster of clicks." (*Id.* at ¶ 144)

In light of these events, Plaintiff alleges that it suffered related damages.  Plaintiff notes that in 2017, three of its advertising affiliates—the Hightower Agency, One Red Cent, and Recruiting CPC Agency—complained to it of low-quality traffic and potentially fraudulent clicks, which Plaintiff later determined to be attributable to Native.  (*Id.* at ¶¶ 147-49)  After concluding its investigation of Native, Plaintiff explained that investigation and its results to these three advertising affiliates, but this news was "poorly received by the . . . affiliates[.]"  (*Id.* at ¶ 150)  In total, Plaintiff refunded $47,374.62 to 14 advertiser affiliates who had "complained of significant volumes of potentially fraudulent click activity that were later attributed to Native"; the figure amounted to monies that these affiliates had previously paid to Plaintiff.  (*Id.* at ¶ 152)  Plaintiff also alleges that in total, it "suffered a loss of revenue as a result [of Native's click fraud scheme]" in the amount of approximately $345,000.  (*Id.* at ¶ 152-53)

## B.     Procedural Background

Plaintiff originally filed this lawsuit in the United States Court for the Southern District of New York in June 2018 against, *inter alia*, Defendants and Mr. Campbell.  (*See* D.I. 1; D.I. 2)  Pursuant to a consent order entered therein, the action as against Mr. Campbell was stayed pending the arbitration of Plaintiff's claims against him; the claims as against Native, Mr. Schollmeyer and Mrs. Banks were transferred to this Court.  (D.I. 60; TAC at 28 n.5; D.I. 85 at 2 n.2)

In August 2019, Plaintiff filed the operative TAC.  (D.I. 82)  Defendants filed the instant Motion on September 25, 2019, (D.I. 84), and the Motion was referred to the Court for resolution by United States District Judge Colm F. Connolly on September 30, 2019, (D.I. 87).  Briefing on the Motion was completed on December 10, 2019.  (D.I. 93)

## II.      STANDARD OF REVIEW

The sufficiency of pleadings for non-fraud claims is governed by Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  A claim alleging fraud or mistake, however, is subject to the more stringent pleading requirements of Federal Rule of Civil Procedure 9(b), which mandates that the "circumstances constituting fraud or mistake" be "state[d] with particularity[.]"  Fed. R. Civ. P. 9(b); *see also Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007).

When presented with a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court conducts a two-part analysis.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  First, the court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions."  *Id.* at 210-11.  Second, the court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  In assessing the plausibility of a claim, the court must "'construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'"  *Id.* at 210 (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).[2]

---

[2]      If Rule 12(b)(6) is used to assert an affirmative defense, dismissal is permitted only if the well-pleaded factual allegations in the complaint, construed in the light most favorable to the plaintiff, suffice to establish the defense.  *See Jones v. Bock*, 549 U.S. 199, 215 (2007); *Kabbaj v. Google, Inc.*, Civ. No. 13-1522-RGA, 2014 WL 1369864, at *2 n.2 (D. Del. Apr. 7, 2014).

## III.   DISCUSSION

In the TAC, Plaintiff brought eight causes of action:  breach of contract (the First Cause of Action), (TAC at ¶¶ 158-69); unjust enrichment (the Second Cause of Action), (*id.* at ¶¶ 170-77); breach of the implied covenant of good faith and fair dealing (the Third Cause of Action), (*id.* at ¶¶ 178-81); tortious interference with an existing contract (the Fourth Cause of Action), (*id.* at ¶¶ 182-99); fraudulent concealment (the Fifth Cause of Action), (*id.* at ¶¶ 200-05); fraud (the Sixth Cause of Action), (*id.* at ¶¶ 206-15); violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.*, (the Seventh Cause of Action), (*id.* at ¶¶ 216-20); and conversion (the Eighth Cause of Action), (*id.* at ¶¶ 221-28).  In its briefing, Plaintiff refers to the first four causes of action as the "contract claims" and the last four causes of action as the "fraud claims."  (D.I. 91 at 4, *see also id.* at 9-10 & n.9)  The Court will do so herein as well.

With the Motion, Defendants seek to dismiss all eight claims.  In response, Plaintiff offers at least some arguments against dismissal with respect to all but two of the claims.[3]

---

[3]      With regard to Defendants' requests to dismiss the Second Cause of Action and the Third Cause of Action (for unjust enrichment and breach of the implied covenant of good faith and fair dealing, respectively), those requests were premised on various grounds.  However, in its answering brief, Plaintiff did not substantively respond to or push back against Defendants' arguments for dismissal of these claims.  (D.I. 91 at 13 n.15)  Instead, Plaintiff noted only that it had pleaded the claims "in the alternative" to its breach of contract claim in the First Cause of Action, "should the Court determine that there is no valid and enforceable contract between the parties[.]"  (*Id.*)  Below, the Court recommends that the First Cause of Action should withstand dismissal.  In light of that, and because Plaintiff did not make any substantive counterargument in support of these claims in its answering brief, the Court concludes that Plaintiff has conceded that these two causes of action should be dismissed.  *See infra* at 20 & n.8.

Moreover, on the merits, as to Plaintiff's unjust enrichment claim, one element of such a claim is that Plaintiff must plead facts plausibly establishing that there is no adequate remedy provided by law.  *See Moon Express, Inc. v. Intuitive Machs., LLC*, Civil Action No. 16-344-LPS-CJB, 2017 WL 4217335, at *8 (D. Del. Sept. 22, 2017).  Yet in the TAC, Plaintiff does not plead facts, even in the alternative, to suggest that the agreements might not be valid and enforceable, or that they may not cover the alleged misconduct at issue.  (TAC at ¶ 174)  And for their part, Defendants noted in their briefing that Plaintiff had alleged "an express, enforceable

Below, the Court will first assess Defendants' argument that the remaining six claims should all be dismissed for failure to satisfy Rule 9(b)'s pleading standard.  Thereafter, the Court will analyze Defendants' other arguments for dismissal as to each of the remaining claims.

### A.     Rule 9(b)

Defendants first argue that Rule 9(b) applies to all of the TAC's claims (both the contract and fraud claims) "because each claim is based on and arises out of an alleged unified course of fraudulent conduct—the purported click fraud scheme."  (D.I. 85 at 5-6 (citing *Satmodo, LLC v. Whenever Commc'ns, LLC*, Case No.: 17-cv-0192-AJB NLS, 2017 WL 1365839, at *3 (S.D. Cal. April 14, 2017)); *see also* D.I. 93 at 2-4).  And they assert that the TAC fails to plead those claims with the requisite particularity.  (D.I. 85 at 7-10)  In response, Plaintiff argues that:  (1) Rule 9(b) does not apply to the contract claims; and (2) regardless, under the particular circumstances here, Plaintiff has pleaded its claims with sufficient specificity.  (D.I. 91 at 4-13)

Even if Plaintiff were required to meet the Rule 9(b) pleading bar for all of its claims,[4] the Court concludes that Plaintiff has sufficiently hurdled that bar.  As an initial matter, it is

---

contract that controls the relationship" between the parties.  (D.I. 85 at 13)  Thus, Plaintiff has not pleaded a plausible unjust enrichment claim as to the Second Cause of Action, and the claim should be dismissed on that basis too.  *See S'holder Representative Servs. LLC v. Medidata Sols., Inc.*, Civil Action No. 19-1312-RGA, 2020 WL 972618, at *4 (D. Del. Feb. 24, 2020).  As to Plaintiff's good faith and fair dealing claim, Plaintiff must plead facts establishing a specific implied contractual obligation, a breach of that obligation and resulting damages.  *Id.*  Yet as Defendants note, (D.I. 85 at 14), Plaintiff did not plead the existence of a specific implied contractual obligation that is at issue.  (TAC at ¶¶ 178-81)  Accordingly, the Court recommends that that this cause of action be dismissed on this additional ground.  *See S'holder Representative Servs.*, 2020 WL 972618, at *5.

    4       With regard to the contract claims, the United States Court of Appeals for the Third Circuit has recognized that Rule 9(b)'s pleading standard can apply to claims that "sound in fraud[,]" even when the claim is not otherwise labeled a "fraud" claim and does not require proof of scienter.  *In re Exxon Mobil Corp. Secs. Litig.*, 500 F.3d 189, 197 (3d Cir. 2007).  It would be somewhat unusual for a breach of contract claim (like that in the First Cause of Action) to implicate Rule 9(b), *see S'holder Representative Servs.*, 2020 WL 972618, at *2 n.2; *In re*

worth noting that the allegations underlying all the claims are quite specific and particularized in many respects.  Though quantity does not always equal quality, the TAC spans 228 paragraphs and 65 pages.  (TAC)  And in Sections IX, X and XI of the TAC, Plaintiff is very specific in articulating:

(1)  How from December 2017 through January 2018, after its affiliates starting complaining of low quality traffic, Plaintiff's employees Mr. Swanson and Mr. Dusanic sought explanations from Mr. Campbell, who in turn, falsely claimed Mr. Schollmeyer and/or Mrs. Banks were resolving the problem and asked that the issue not be disclosed to Mr. Hayward.;

(2)  That Mr. Campbell was in fact working as Mr. Schollmeyer and Mrs. Banks' "inside man" during this time period, to help hide the fraud.;

(3)  That Mr. Campbell received an expensive gift from Mr. Schollmeyer in June or July 2017 in furtherance of this scheme.;

(4)  That Mr. Schollmeyer had various conversations with Mr. Hayward, including conversations taking place from January 28, 2018 through February 2, 2018, in which Mr. Schollmeyer falsely reassured Mr. Hayward that no violation of the relevant agreements had occurred.;

(5)  How Mr. Hayward learned of the working relationship between Mr. Schollmeyer and Mr. Campbell in late February through early March 2018, when he accessed Mr. Campbell's old work computer, discovered relevant e-mail conversations between the two men and actually communicated with Mr. Schollmeyer by e-mail while posing as Mr. Campbell.; and

---

*Fruehauf Trailer Corp.*, 250 B.R. 168, 197-98 (D. Del. 2000), but sometimes courts have found that such a claim does so when the alleged breach of contract was clearly premised on allegedly fraudulent acts, *see Openwave Messaging, Inc. v. Open-Xchange, Inc.*, Case No. 16-cv-00253-WHO, 2016 WL 6393503, at *8 (N.D. Cal. Oct. 28, 2016); *In re MSR Hotels & Resorts, Inc.*, Case No. 13-11512 (SHL), 2013 WL 5716897 (Bankr. S.D.N.Y. Oct. 1, 2013).  And this Court has also recognized that Rule 9(b) can apply to "contract-like" claims for breach of the covenant of good faith and fair dealing.  *See Toner v. Allstate Ins. Co.*, 821 F. Supp. 276, 283-85 (D. Del. 1993)  In any event, even assuming *arguendo* that Rule 9(b) applies to all the claims, for the reasons set out below, those claims were framed with sufficient specificity (under the circumstances).  Thus, the Court need not assess this issue further.

> (6)  How conversion data relating to Native from March 2017
> through March 2018 demonstrated various specified anomalies,
> which in turn suggested that Native had engaged in the
> manufacture or generation of "false clicks" (including the use of a
> useragent associated with automated, fake click activity).

(*Id.* at ¶¶ 101-145; *see also* D.I. 91 at 11 n.12)  These allegations contain a lot of what one would

typically expect to see in a pleading governed by Rule 9(b):  i.e., "the who, what, when, where

and how of the events at issue[,]" or other similar indication of particularity.  *Am. Cruise Lines,*

*Inc. v. HMS Am. Queen Steamboat Co. LLC*, 223 F. Supp. 3d 207, 212 (D. Del. 2016).

In asserting that the TAC's allegations nevertheless fail Rule 9(b)'s test, Defendants

primarily focus on the fact that:  (1) sometimes when the fraud allegations refer to the acts of Mr.

Schollmeyer or Mrs. Banks, they do not clearly indicate which of the two did the act, and instead

rely on the phraseology "Schollmeyer and/or Banks[,]" (D.I. 85 at 8-9 (citing TAC at ¶¶ 93-98));

and (2) when the TAC explains the particular strategies that Defendants allegedly used to

manipulate volumes of click activity, it again uses the phrase "and/or" and lists out a number of

methods that likely *may have been* used (but indicates that Plaintiff is not certain of exactly what

methods *were in fact used*), (D.I. 85 at 7-8; *see also* TAC at ¶ 94).  This is true, as the TAC does

just that.

But as the United States Court of Appeals for the Third Circuit has recognized, Rule

9(b)'s requirements are "relaxed . . . when factual information [about the alleged fraud] is

peculiarly within the defendant's knowledge or control[,]" so long as the plaintiff pleads facts

alleging that "the necessary information lies within defendants' control, and [accompanies] their

allegations . . . [with] a statement of the facts upon which the allegations are based."  *Craftmatic*

*Secs. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989); *Kyko Global, Inc. v. Prithvi Info. Sols.*

*Ltd.*, Civil Action No. 2:18-cv-01290-WSS, 2020 WL 1159439, at *24 (W.D. Pa. Mar. 10,

2020).  And this is exactly what Plaintiff does here.  It alleges that certain details of the scheme

(such as whether it was Mr. Schollmeyer or Mrs. Banks or both who took certain actions,[5] or

which particular means the two used in order to increase clicks in a fraudulent manner) are

within Defendants' control—since Mr. Schollmeyer and Mrs. Banks conducted their alleged

scheme in secret and because Mr. Campbell, their co-conspirator, "wiped" the contents of his

company-issued laptop prior to returning it to Plaintiff.  (TAC at ¶¶ 93-100 & page 31 n.6)  And

it accompanies its allegations with a statement of all of the facts about the scheme that it can

reasonably muster at this stage.  *See Kyko Global*, 2020 WL 1159439, at *24 (finding allegations

sufficient to meet Rule 9(b)'s requirements when the plaintiffs recited "a descriptive chronology

of events . . . includ[ing] dates, times, and locations" of fraudulent activities and further "some

measure of substantiation for the fraudulent activity"); *Gelis v. Bayerische Motoren Werke*

---

[5]         With regard to Defendants' concern about Plaintiff "lump[ing] together" Mr.
Schollmeyer and Mrs. Banks, it is true that normally, when a plaintiff asserts fraud claims, Rule
9(b) requires that the plaintiff separately plead the allegedly fraudulent acts of *each* defendant.
*MDNet, Inc. v. Pharmacia Corp.*, 147 F. App'x 239, 245 (3d Cir. 2005).  But in cases like this,
where details about the alleged fraud at issue are peculiarly in the control of the defendants, there
is "no per se rule that group pleading cannot satisfy Rule 9(b)."  *In re Genesis Health Ventures,
Inc.*, 355 B.R. 438, 455 (Bankr. D. Del. 2006) (internal quotation marks and citations omitted);
*see also Buckley v. O'Hanlon*, No. 04-955GMS, 2007 WL 956947, at *9 (D. Del. Mar. 28,
2007); *MBIA Ins. Corp. v. Royal Indem. Co.*, 221 F.R.D. 419, 421 (D. Del. 2004); *In re Fruehauf
Trailer Corp.*, Bankruptcy No. 96-01563 (PJW), 2011 WL 2838168, at *5 (Bankr. D. Del. July
15, 2011).  Moreover, there are numerous paragraphs in the TAC where it is alleged that
"Schollmeyer[] *and* Banks[]" are alleged to have participated in the fraud in various ways.  (TAC
at ¶¶ 108-10, 117, 125, 128-29, 132-34, 137, 140-41, 146-47, 149, 154-57 (emphasis added))
And under the circumstances (i.e., that the two are married, live at the same address that is also
Native's principal place of business, are the only two principals at the company, both maintained
a close friendship with Mr. Campbell and both stood to benefit from the alleged fraud), it is
plausible that they *both did* participate in the alleged scheme (and acted on behalf of Native in
doing so) in these ways.  For these reasons, the Court also rejects Defendants' additional
assertion that "Plaintiff pleads no facts leading to an inference that Defendants were personally
involved in or had specific knowledge regarding the alleged 'fraudulent clicks.'"  (D.I. 85 at 10)

*Aktiengesellschaft*, No. 2:17-cv-07386, 2018 WL 6804506, at *8 (D.N.J. Oct. 30, 2018) (finding allegations sufficient under Rule 9(b), where while plaintiffs may not have been able to specify all of the "time, place, and specific content" of the fraud (because it involved fraudulent omissions by defendant and other information that was in defendant's exclusive control), the plaintiff was nevertheless able to substantiate the claim with "evidence ranging from consumer complaints to data").

For these reasons, the Court recommends that the Motion be denied to the extent it argues that the claims should be dismissed due to a failure to satisfy Rule 9(b)'s pleading requirements.

**B.    Other Asserted Bases for Dismissal**

The Court now addresses Defendants' other arguments for dismissal as to the six causes of action still at issue.

**1.    First Cause of Action:  Breach of Contract**

In the First Cause of Action, Plaintiff pleads breach of contract against all three Defendants.  (TAC at 1, 44)  To state a claim for breach of contract, a plaintiff must allege facts indicating:  (1) the existence of a contract; (2) the breach of an obligation imposed by that contract; and (3) resultant damages to the plaintiff.  *Pharm. Corp. of Am. v. Askari*, C. A. No. 16-1123-RGA-MPT, 2018 WL 2108200, at *5 (D. Del. May 7, 2018); *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009).

Defendants argue the TAC alleges that it was *Native* who entered into the agreements with Plaintiff (and that Mr. Schollmeyer and Mrs. Banks entered into those contracts "on [Native's] behalf" and as Native's "representative(s)"); they argue there is thus no basis to find Mr. Schollmeyer and Mrs. Banks *individually* liable as to this claim.  (D.I. 85 at 12 (citing TAC

at ¶¶ 2-3); D.I. 93 at 7)[6]  Plaintiff's response is that the TAC *does* sufficiently plead such a basis for individual liability—in that sufficiently alleges that Mr. Schollmeyer and Mrs. Banks are Native's alter ego.  (D.I. 91 at 15)

Pursuant to Delaware law,[7] for Plaintiff to plead facts establishing the potential for alter ego liability, it would have to make a sufficient showing as to two elements:  (1) that the corporation and its shareholders did not operate as legally distinct entities, and (2) that there has been an element of fraud, injustice or inequity in the use of the corporate form.  *See Fidelity Nat'l Info. Servs., Inc. v. Plano Encryption Techs., LLC*, Civil Action No. 15-777-LPS, 2016 WL 1650763, at *4 (D. Del. Apr. 25, 2016) (citing cases).  As to the first of these inquiries (i.e., whether the corporation and its shareholders operated as legally distinct entities), Delaware

---

[6]      In their opening brief, Defendants also argue for dismissal of these claims on the basis that "the alleged contracts . . . are unsigned and do not specify the parties thereto."  (D.I. 85 at 12)  But in response, Plaintiff pointed out that the agreements are clickwrap agreements, and that in the TAC, it had alleged that Defendants manifested their assent to the contracts by clicking certain boxes or buttons on the Signup Form.  (*See* D.I. 91 at 14-15 (citing TAC at ¶¶ 88-92)  And in their reply brief, Defendants did not explain why this counter-argument is incorrect.  To the extent that Defendants did not abandon this argument, the Court finds that Plaintiff's allegations are sufficient to plausibly plead that there was assent by each side (that is, Plaintiff and at least Defendant Native) to these agreements, even though there are no signature pages on the agreements.  *See Defillipis v. Dell Fin. Servs.*, No. 3:14-CV-00115, 2014 WL 4198015, at *6 (M.D. Pa. Aug. 22, 2014); *Feldman v. Google, Inc*., 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007).

[7]      Defendants assert that Delaware law applies to this analysis, (D.I. 93 at 7), and the Court will assume *arguendo* that it does.  That said, Native is a Florida limited liability company, (TAC at ¶ 8), and there is some authority for the proposition that pursuant to Delaware's choice of law rules, Florida law should govern the veil piercing analysis here.  *See In re Washington Mut., Inc.*, 418 B.R. 107, 114 (Bankr. Del. 2009) (citing *Rosenmiller v. Bordes*, 607 A.2d 465, 468-69 (Del. Ch. 1991)).  Even if Florida law applied, however, Florida's law is materially similar to Delaware law in this regard, *see Century Sr. Servs. v. Consumer Health Ben. Ass'n*, 770 F. Supp. 2d 1261, 1265 (S.D. Fla. 2011), and so the Court doubts that the outcome would be any different.

courts consider a number of factors, including:  (1) whether the corporation is adequately

capitalized; (2) whether the corporation is solvent; (3) whether corporate formalities were

observed (i.e., whether dividends were paid, corporate records kept, or officers and directors

functioned properly); (4) whether the controlling shareholder siphoned company funds; or (5) in

general, whether the corporation simply acted as a façade for the controlling shareholder.  *Id.*

(citing cases).

   In the Court's view, the TAC does enough to plead a plausible case for alter ego liability.

To that end, the TAC includes the following factual allegations relevant to a lack of corporate

separateness:

- Mr. Schollmeyer and Mrs. Banks are the sole LLC members and sole employees of Native.  (TAC at ¶¶ 9, 18, 25);

- Native's principal place of business is an address that is also the home of Mr. Schollmeyer and Mrs. Banks.  (*Id.* at ¶¶ 20-25); and

- Plaintiff, by its own investigations and diligence, "ha[s] failed to identify even a single other entity that has [ever] conducted business with Native[.]"  (*Id.* at ¶ 25)

These three facts speak to the third and fifth corporate separateness factors.  And though not

robust, they are sufficient to make out a plausible case for alter ego liability—i.e., they provide

indication that Native may not have observed corporate formalities, and that it was simply "a

façade" for Mr. Schollmeyer and Mrs. Banks.  *See MetLife Inv'rs USA Ins. Co. v. Star Lite

Brokerage, Inc.*, No. C.A. 11-911-LPS, 2012 WL 4783231, at *4 (D. Del. Oct. 3, 2012)

(allowing amendment of a claim to include allegations regarding piercing the corporate veil,

where the individual defendant at issue was the owner and sole shareholder of the defendant

corporation).  Additionally, the Court can plausibly see how the alleged misuse of the corporate

form could create an element of injustice or inequity.  Plaintiff has alleged that it was Mr.

Schollmeyer and Mrs. Banks who were the instigators of the alleged click fraud scheme, and that it would be unjust to allow them to escape liability by: (1) creating Native; (2) causing Native to enter into the offending agreements; and then (3) hiding behind Native's corporate shell to avoid the consequences of the resultant fraud. (TAC at ¶ 28); *see also MIG Invs. LLC v. Aetrex Worldwide, Inc.*, 852 F. Supp. 2d 493, 514 (D. Del. 2012).

As such, the Court recommends denying Defendants' Motion as to the First Cause of Action.

### 2.    Fourth Cause of Action:  Tortious Interference with an Existing Contract

The Fourth Cause of Action, a claim for tortious interference with an existing contract, is pleaded against Defendants Mr. Schollmeyer and Mrs. Banks only. (TAC at 51)

Defendants argue that this claim should be dismissed for various reasons, the first of which is that it (as well as the Fifth through Eighth Causes of Action) is barred by Delaware's economic loss doctrine. (D.I. 85 at 10-11) This doctrine prohibits a party from recovering in tort for economic losses, the entitlement to which flows only from a contract between the parties; it provides that "where an action is based entirely on a breach of the terms of a contract between the parties and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort." *Edelstein v. Goldstein*, C.A. No. 09C-05-034 DCS, 2011 WL 721490, at *7 (Del. Super. Ct. Mar. 1, 2011) (internal quotation marks and citation omitted); *see also Collab9, LLC v. En Pointe Techs. Sales, LLC*, C.A. NO. N16C-12-032 MMJ CCLD, C.A. NO. N19C-02-141 MMJ CCLD, 2019 WL 4454412, at *3 (Del. Super. Ct. Sept. 17, 2019). Here, Defendants point to paragraph 198 of the TAC (a part of the Fourth Cause of Action), in which Plaintiff alleges that "[Mr.] Schollmeyer's and [Mrs.] Banks's inducement of [Mr.] Campbell's breach [of his employment contract with Plaintiff—i.e., the contract that the two Defendants

allegedly interfered with] . . . *is conduct proscribed by the various Program Agreements*[.]"
(TAC at ¶ 198 (emphasis added) (*cited in* D.I. 85 at 11))

That paragraph seems pretty damning as to this ground for dismissal, as on its face it
frames the cause of action in terms of how the two Defendants' actions evidence a violation of
the *contracts at issue in the First Cause of Action.*  And were there any remaining doubt as to
whether the claim should survive, it was dispelled by Plaintiff's answering brief.  There, Plaintiff
simply did not respond to Defendants' argument about why the economic loss doctrine bars this
cause of action.  (*See* D.I. 91 at 15-16; *see also* D.I. 93 at 7)  Where a movant provides multiple
arguments about why an opposing side's claim should be dismissed, and in its answering brief,
the non-movant simply ignores or fails to address one of those arguments, that is strong
indication that the non-movant is implicitly conceding the strength of the ground that it did not
address.  *Cf. Progressive Sterilization, LLC v. Turbett Surgical LLC*, Civ. No. 19-627-CFC, D.I.
51 at 4-5 (D. Del. June 10, 2020) (citing cases).[8]

Because it appears on the merits that the economic loss doctrine would bar this claim as
pleaded, and because Plaintiff appears to have conceded the strength of that argument, the Court
recommends that the Fourth Cause of Action be dismissed.  The Court thus need not address any
of Defendants' other proffered bases for dismissal.  (D.I. 85 at 15)

---

[8]        *See also Lawlor v. ESPN Scouts, LLC*, Civil Action No. 2:10-cv-05886, 2011 WL
675215, at *2 (D.N.J. Feb. 16, 2011) (finding a promissory estoppel claim abandoned where the
defendants, in moving to dismiss, argued that the plaintiff was paid the amount owed, and where
the plaintiff did not respond in any way to the defendants' argument) (citing *Conroy v. Leone*,
316 F. App'x 140, 144 n.5 (3d Cir. 2009) ("We find this undeveloped argument has been
waived.")); *Carraway v. Borough of Wilkinsburg*, C.A. No. 9-372, 2009 WL 2981955, at *2
(W.D. Pa. Sept. 11, 2009) ("The Court 'may, and generally will, deem a claim abandoned when
a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.'")
(citations omitted); *Seals v. City of Lancaster*, 553 F. Supp. 2d 427, 432 (E.D. Pa. 2008)
("Plaintiff failed to address this portion of defendants' motion for summary judgment in her
response.  Therefore, plaintiff's failure . . . constitutes abandonment of those claims.").

### 3.   Fifth Cause of Action:  Fraudulent Concealment

In the Fifth Cause of Action, Plaintiff brings a claim for fraudulent concealment against all three Defendants.  (TAC at 55)  A claim for fraudulent concealment under Delaware law requires a showing of:  (1) deliberate concealment by the defendant of a material past or present fact, or silence in the face of a duty to speak; (2) that the defendant acted with scienter; (3) an intent to induce plaintiff's reliance upon the concealment; (4) causation; and (5) damages resulting from the concealment.  *See Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987).

Defendants argue multiple bases for dismissal, the first of which is that this claim is also barred by the economic loss doctrine.  (D.I. 85 at 16)  Yet here—unlike with the Fourth Cause of Action—Plaintiff *does* push back against this argument.  It asserts that the Defendants had a duty to disclose the existence of their fraud that was owed independent of the three agreements at issue, since "nowhere in those agreements is any explicit disclosure obligation to be found." (D.I. 91 at 16)[9]

Whatever the merit of Plaintiff's "independent duty" argument, in the end, this claim cannot survive due to another of Defendants' proffered bases for dismissal.  Under Delaware law, a plaintiff pleading a claim for fraud must also show, *inter alia*, "damages as a result of a defendant's actions [and that these] damages allegations [do] not simply 'rehash' the damages allegedly caused by the breach of contract."  *Cornell Glasgow, LLC v. La Grange Props., LLC*, C.A. No. N11C-05-016 JRS CCLD, 2012 WL 2106945, at *8 (Del. Super. Ct. June 6, 2012); *see also ITW Global Invs. Inc. v. Am. Indus. Partners Capital Fund IV, L.P.*, C.A. No.: N14C-10-236 JRJ CCLD, 2015 WL 3970908, at *5 (Del. Super. Ct. June 24, 2015) (dismissing a claim for

---

[9]      In the TAC's Fifth Cause of Action, Plaintiff also pleads the same thing:  i.e., that Defendants owed Plaintiff such a duty "[s]eparate and apart from, and independent of, any duty borne of the various agreements entered into by them[.]"  (TAC at ¶ 202)

fraud because "it plead[ed] damages that [were] simply a 'rehash' of the breach of contract damages."); (D.I. 85 at 16).  Yet in the Fifth Cause of Action, Plaintiff does not include any allegation regarding the damages it is owed due to fraudulent concealment.  (*See* TAC at ¶¶ 200-05)  In light of that, the Court can only infer that the asserted damages owed are those otherwise described in the body of the TAC, (*id.* at ¶¶ 152-53), which are alleged to be damages flowing from Defendants' breach of contract, (*id.* at ¶ 169).  (*See also id.* at 63 (Plaintiff, in the TAC's "Prayer for Relief[,]" indicating that the compensatory damages owed for the breach of contract claim in the First Cause of Action are the same damages that are owed as to this claim))  Because the damages allegedly owed from this fraudulent concealment claim are simply a "rehash" of Plaintiff's breach of contract damages, the claim must fail.  *See Cornell Glasgow*, 2012 WL 2106945, at *8-9; *see also EZLinks Golf, LLC v. PCMS Datafit, Inc.*, C.A. No. N16C-07-080 PRW CCLD, 2017 WL 1312209, at *7 (Del. Super. Ct. Mar. 13, 2017).

Accordingly, the Court need not address other of Defendants' arguments for dismissal of this claim, (D.I. 85 at 17), and recommends that Defendants' Motion be granted as to the Fifth Cause of Action.

### 4.    Sixth Cause of Action:  Fraud — Intentional Misrepresentation

In the Sixth Cause of Action, Plaintiff brings a claim for "Fraud — Intentional Misrepresentation" against all Defendants.  (TAC at 58)  The Court understands this to be a claim for common law fraud, which consists of five elements:  (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless disregard of the truth; (3) an intent to induce plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.

22

*Johnson v. Preferred Prof'l Ins. Co.*, 91 A.3d 994, 1017 (Del. Super. Ct. 2014); *Radius Servs., LLC v. Jack Corrozi Constr., Inc.*, C.A. No. 09L-02-046 (JTV), 2009 WL 3273509, at *2 (Del. Super. Ct. Sept. 30, 2009). These claims are grounded in, *inter alia*, Defendants' allegedly false statements that: (1) their clicks were genuine (when in fact they were not); (2) they were unaware that these clicks were false (when in fact they were); and (3) they were rightfully entitled to compensation for these clicks. (TAC at ¶ 211)[10]

In their Motion, Defendants argue for dismissal of this claim on several grounds; one such ground is the economic loss doctrine. (D.I. 85 at 10-11, 17; D.I. 93 at 7) And as with the Fourth Cause of Action, here Plaintiff never responds to this challenge in its briefing. (D.I. 91 at 17) Thus, it implicitly concedes the strength of Defendants' argument.

Moreover, on the merits, under Delaware law, fraud claims that go toward the *inducement* of a contract are not barred by the economic loss doctrine, but fraud claims that go toward the *performance* of the contract are barred. *Alltrista Plastics, LLC v. Rockline Indus., Inc.*, C.A. No. N12C-09-094 JTV, 2013 WL 5210255, at *4 (Del. Super. Ct. Sept. 4, 2013); *Brasby v. Morris*, No. C.A. 05C-10-022-RFS, 2007 WL 949485, at *7 (Del. Super. Ct. Mar. 29, 2007). And here, it does appear that the conduct that underlies this claim is conduct that: (1) relates to Plaintiff's performance under the contract and (2) underlies Plaintiff's breach of conduct claim. (*Compare* TAC at ¶ 166 (alleging with respect to the breach of contract claim that Defendants breached the agreements when they engaged in a scheme to "artificially inflat[e] the volume of clicks attributable to them") *with id.* at ¶ 211 (alleging with respect to the Sixth

---

[10]     In this claim, Plaintiff also asserts that each fraudulent click that was part of the alleged scheme was also itself an actionable misrepresentation. (TAC at ¶¶ 209-10) Defendants argue to the contrary that "a click is not a representation, nor [one] that Defendants made to Plaintiff." (D.I. 85 at 17) The Court need not resolve this issue, as the claim also includes other clearly asserted misrepresentations made by Defendants (as set out above).

Cause of Action that Defendants' fraud, *inter alia*, came when Defendants made false statements about the fact that they had engaged in fraudulent click activity, and demanded "compensation for . . . what were known to them to be false and fraudulent click volumes for which they were barred from seeking payment")) Additionally, as with the Fifth Cause of Action, Plaintiff's alleged damages for this claim are simply a rehash of its alleged damages as to its breach of contract claim. (TAC at ¶ 215 & 63-64 (Plaintiff, in the TAC's "Prayer for Relief[,]" indicating that the compensatory damages owed for the breach of contract claim in the First Cause of Action are the same damages that are owed for this claim)) This provides yet another basis for dismissal.

For all of these reasons, the Court need not address any other of Defendants' arguments for dismissal, (D.I. 85 at 17), and recommends that Defendants' Motion be granted as to the Sixth Cause of Action.

### 5.    Seventh Cause of Action:  Violation of the CFAA

In the Seventh Cause of Action, Plaintiff brings a claim for "violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 ["Section 1030"] *et. seq.*" against all Defendants. (TAC at 60) In the TAC and in its answering brief, Plaintiff does not state which subsection of Section 1030 is at issue. The Court assumes, in light of the wording of the cause of action and the nature of this suit, that Plaintiff means to implicate Section 1030(a)(4). To state a claim for civil liability under Section 1030(a)(4), a plaintiff must sufficiently plead that a defendant: "(1) [] has accessed a 'protected computer;' (2) has done so without authorization or by exceeding such authorization as was granted; (3) has done so 'knowingly' and with 'intent to defraud'; and (4) as a result has 'further[ed] the intended fraud and obtain[ed] anything of value.'" *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir.

2005) (certain alterations in original); *see also QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576, 597-98 (E.D. Pa. 2016).

Defendants move to dismiss this claim on two grounds.  One is Defendants' argument that the alleged "click fraud" scheme cannot, as a legal matter, amount to accessing a protected computer "without authorization" or in a manner that "exceeds authorized access."  Citing to case law from the United States Court of Appeals for the Ninth Circuit, Defendants argue that access "without authorization" is limited to situations where a defendant engages in computer "hacking."  (D.I. 85 at 18-19 (citing *United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012); *Incorp Servs Inc. v. Incsmart.Biz Inc*., No. 11-CV-4660-EJD-PSG, 2012 WL 3685994, at *3 (N.D. Cal. Aug. 24, 2012)); *see also* 18 U.S.C. § 1030(a)(4).[11]

In *CollegeSource, Inc. v. AcademyOne, Inc.*, 597 F. App'x 116 (3d Cir. 2015), the Third Circuit addressed this issue in affirming a trial court's grant of summary judgment to a defendant regarding the plaintiff's CFAA claims.  The *CollegeSource* Court first noted that the CFAA's "without authorization" and "exceeds authorized access" terminology both rely on the root term "authorization"; it explained that though "'authorization'[]is not defined by the statute, [it] has been the subject of robust debate" and should be afforded its ordinary meaning.  597 F. App'x at

---

[11]     Defendants also argue that in light of Delaware's economic loss doctrine, Plaintiff's CFAA claim is barred.  (D.I. 85 at 10-11; D.I. 93 at 7)  Again, Plaintiff did not specifically respond to this argument in its brief.  (D.I. 91 at 17-18; *see also* D.I. 93 at 7) However, the Court has located case law suggesting that a state's economic loss doctrine (or similar state law doctrines) cannot serve to bar a federal statutory claim like the CFAA claim here.  *See In re Apple Inc. Device Performance Litig.*, 347 F. Supp. 3d 434, 453 (N.D. Cal. 2018), *aff'd in relevant part upon reconsideration*, 386 F. Supp. 3d 1155, 1182 (N.D. Cal. 2019); *The Knit With v. Knitting Fever, Inc.*, Civil Action Nos. 08-4221, 08-4775, 2009 WL 3427054, at *7 (E.D. Pa. Oct. 20, 2009); *cf. Diodato v. Wells Fargo Ins. Servs., USA, Inc.*, 44 F. Supp. 3d 541, 576 (M.D. Pa. 2014); *Sproul Hill Assocs., L.P. v. Newell Rubbermaid Inc.*, Civil Action No. 13-4998, 2013 WL 6731976, at *3 (E.D. Pa. Dec. 23, 2013).  So the Court does not believe this is a basis upon which it can recommend dismissal.

129.  In analyzing whether there was sufficient evidence that the defendant had accessed

plaintiff's computers "without authorization," the Third Circuit assessed two sets of defendant's

conduct:  (1) that defendant's employees had created trial accounts for the plaintiff's

"CollegeSource Online" database (a database located on plaintiff's servers) and (2) that

defendant possessed course catalogs obtained from the web pages of colleges that subscribed to

plaintiff's "CataLink" service (a service that the colleges used to store their catalog information

on plaintiff's servers).  *Id.* at 120, 129-30.  In holding that neither set of evidence amounted to

the access of plaintiff's computers "without authorization," the Third Circuit noted that:  (1) as to

the CollegeSource Online database, there was "no evidence . . . that [defendant's] employees

downloaded catalogs for commercial use *in violation of the Subscription Agreement* [that a user

of the database enters into with plaintiff], hacked into technologically sequestered portions of the

database, or even so much as viewed any particular document"; and (2) as to the CataLink

service, because the materials obtained from CataLink were "available without precondition to

any member of the general public who clicked the link on the subscribing school's website and

was thereby directed to [plaintiff's] servers[,]" defendant obtained the materials "without

breaching any technological barrier *or contractual term of use*."  *Id.* at 129-30 (emphasis added).

This reasoning indicates that in the Third Circuit's view, a defendant need not "hack" a

plaintiff's server in order to access a plaintiff's computer "without authorization" pursuant to the

CFAA.  Instead, if the defendant accesses the plaintiff's computers and uses information in

violation of a contractual agreement with the plaintiff, that could be enough.[12]  And that is

---

[12]     *See also Christie v. Nat'l Inst. for Newman Studies*, Civ. Action No. 16-6572
(FLW), 2019 WL 1916204, at *5 (D.N.J. Apr. 30, 2019) (citing *CollegeSource* for the
proposition that "an individual who is authorized to use a computer for a certain purpose but
goes beyond those limitations is considered by the CFAA as someone who has 'exceed[ed]
authorized access.'") (alteration in original) (citations omitted); *Sandvig v. Sessions*, 315 F.

essentially what is alleged to have happened here:  that Defendants violated the terms of contractual agreements with Plaintiff by causing illegitimate clicks to be directed to Plaintiff's computer servers.  (*See* TAC at ¶¶ 130-45, 166, 217)

For these reasons, the Court rejects Defendants' challenges to this claim, and therefore recommends denying Defendants' Motion as to the Seventh Cause of Action.

### 6.    Eighth Cause of Action:  Conversion

In the Eighth Cause of Action for conversion, Plaintiff brings the claim against all Defendants.  (TAC at 61-62)  In this claim, Plaintiff's theory is that Defendants wrongfully obtained from Mr. Campbell other publishers' "Registered User Data" (i.e., confidential information of those publishers' users, such as names, e-mail addresses and the like), in order to engage in the "click fraud scheme and other misconduct *in violation of the various Program Agreements*[.]"  (*Id.* at ¶¶ 57, 96-98, 223-26 (emphasis added))

Defendants first assert that this claim is barred by the economic loss doctrine.  (D.I. 85 at 10-11)  As noted above, the claim does frame the wrong at issue in terms of amounting to a violation (or breach) of the three agreements at issue.  (TAC at ¶¶ 223-34)  Moreover, Plaintiff did not respond to this argument in its answering brief, thus implicitly conceding the strength of the argument.

Additionally, this Court has recognized that "'[a]n action for conversion has traditionally applied to the wrongful exercise of dominion over tangible goods.'"  *Hydrogen Master Rights, Ltd. v. Weston*, 228 F. Supp. 3d 320, 335 (D. Del. 2017) (quoting *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.*, Civ. A. No. 13950, 1995 WL 694397, at *16 (Del. Ch. Nov. 21, 1995)).

---

Supp. 3d 1, (D.D.C. 2018) (citing *CollegeSource* for the proposition that a violation of a website's terms of service exceeds authorized access for purposes of the CFAA).

While Delaware courts have tentatively expanded the doctrine of conversion to encompass some intangible goods where the intangible property relations are merged into a document, conversion is not available as a theory of recovery when a plaintiff "do[es] not seek recovery of the tangible objects containing the confidential information." *Id.* (citing *Carlton*, 1995 WL 694397, at *16 (holding that "'conversion is not an available theory of recovery to plaintiff insofar as it complains of . . . the intangibles not represented in an instrument.'")).  Nowhere in this claim does Plaintiff allege that any tangible object was "converted" and should be returned; instead, it asserts only that intangible information (the Registered User Data) was wrongfully obtained. (TAC at ¶¶ 221-28; D.I. 91 at 18)  Thus, this provides another basis for dismissal. *See Hydrogen Master Rights*, 228 F. Supp. 3d at 335.

 For all of the above reasons, the Court need not address other of Defendants' arguments for dismissal of the claim, (D.I. 85 at 20), and recommends dismissal of the Eighth Cause of Action.

## IV. CONCLUSION

 For the foregoing reasons, the Court recommends that Defendants' Motion be GRANTED-IN PART and DENIED-IN-PART.  More specifically, the Court recommends that Defendants' Motion be DENIED as to the First and Seventh Causes of Action and be GRANTED as to the Second, Third, Fourth, Fifth, Sixth and Eighth Causes of Action.

 With regard to the Second, Third, Fourth, Sixth and Eighth Causes of Action, in light of the circumstances of dismissal (which include Plaintiff failing to even address certain prevailing arguments made by Defendants), the Court does not believe that it is appropriate to permit the opportunity to amend.  As to the Fifth Cause of Action, however, it may well be possible for Plaintiff to articulate a damages claim there that is distinct from the damages its seeks with

regard to its breach of contract claim.  In light of this, because Plaintiff seeks the opportunity to amend, (D.I. 91 at 18), because this is the first time the Court has found the claim to be deficiently pleaded, and because leave to amend should be given freely "when justice so requires[,]" Fed. R. Civ. P. 15(a)(2), the Court recommends that Plaintiff be given this opportunity.  Therefore, the Court also recommends that if the District Court affirms its decision herein, Plaintiff be given no more than 14 days to amend its complaint as to this one claim.  It otherwise recommends that the Second, Third, Fourth, Sixth and Eighth Causes of Action be dismissed with prejudice.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.


Dated:  June 15, 2020

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

29